382 F.2d 437
 John L. LEWIS, Henry G. Schmidt and Josephine Roche, as
Trustees of the United Mine Workers of America
Welfare and Retirement Fund of 1950,
v.
SEANOR COAL COMPANY, a Corporation, Appellant.
 No. 16161.
 United States Court of Appeals Third Circuit.
 Argued March 10, 1967.
Decided Aug. 16, 1967, Rehearing Denied Sept. 28, 1967.
 
 James Q. Harty, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (Norman William Smith, Jr., Pittsburgh, Pa., on the brief), for appellant.
 Harold H. Bacon, United Mine Workers of America, Welfare and Retirement Fund, Washington, D.C. (Welly K. Hopkins, Washington, D.C., and Kenneth J. Yablonski, Washington, Pa., on the brief), for appellees.
 Before McLAUGHLIN, HASTIE and FREEDMAN, Circuit Judges.
 OPINION OF THE COURT
 FREEDMAN, Circuit Judge:
 
 
 1
 The trustees of The United Mine Workers of America Welfare and Retirement Fund of 1950 brought this action against Seanor Coal Company, the appellant, for royalty payments of forty cents per ton as fixed by the National Bituminous Coal Wage Agreement as amended in 1964, on coal produced by the company between February 1 and June 30, 1965. They claimed also the balance on a promissory note which they alleged was accelerated because of the default in the payment of royalties. The company counterclaimed for payment it had made earlier into the welfare and retirement fund under the forty cents royalty provision of the agreement.[1] The court below entered summary judgment in favor of the plaintiffs for the royalties, amounting to $38,110.93 with interest, and for the unpaid balance of the note in the amount of $52,441.82 with interest, and also entered summary judgment in favor of the plaintiffs on the company's counterclaim. (256 F.Supp. 456 (W.D.Pa.1966)). The company presents a number of issues. It asserts that (1) the agreement requiring the payment of royalties violates the Sherman Antitrust Act; (2) it also violates 8(e) of the National Labor Relations Act; and (3) the union did not fulfill an oral agreement made by the president of the local union on which the company relied in reopening its mine, which relieved it of its contractual obligation to pay royalties.
 
 I.
 
 2
 In support of its contention that the provision for the payment of royalties under the agreement is illegal under the hot cargo prohibition of 8(e) of the National Labor Relations Act, the company relies upon two decisions of the National Labor Relations Board. Raymond O. Lewis, 144 N.L.R.B. 228 (1963), held invalid under 8(e) the subcontracting provision of the 1958 National Bituminous Coal Wage Agreement which required that the terms and conditions of employment for subcontracting operations be at least as favorable as those fixed for employees of signatories of the agreement. Later, the board dealt with the subsequent 1964 agreement, which discontinued this requirement but added a new provision which in addition to increasing from thirty to forty cents the royalty payments to the fund for every ton of coal produced by the operator for use or for resale, also required for the first time an eighty cent royalty on coal which an operator acquired from a nonsignatory.[2] The Board held that this new provision also violated 8(e). Raymond O. Lewis, 148 N.L.R.B. 249 (1964). The first decision, dealing with the 1958 agreement, came before the Court of Appeals for the District of Columbia, which remanded the case to the Board for reconsideration in the light of recent decisions rejecting the Board's interpretation of 8(e). Lewis v. NLRB, 122 U.S.App.D.C. 18, 350 F.2d 801 (1965). The court noted that its action undermined the Board's finding in the second case that the 1964 amendment violated 8(e).[3] A trial examiner's subsequent decision that the 1964 agreement violated 8(e) has not yet been acted on by the Board.
 
 
 3
 The court below believed that the question whether the provision of the 1964 agreement was illegal as an unfair labor practice under 8(e) was one for the exclusive jurisdiction of the Board. We believe it is unnecessary to decide this question.[4] For even if the Board should again reach the same conclusion regarding the provision before it, the company would not thereby be relieved of its obligation to pay the royalties here involved. The Board dealt in the first case with an entirely different provision from that which is here involved; and in the second case it dealt not with the forty cent royalty which is here involved, but with the effect of that provision in relation to the establishment for the first time in the 1964 agreement of a difference in the royalties exacted from an operator if he purchased from nonsignatory rather than from other signatory opoperator if he purchased from nonsignaroyalties where the purchase was from nonsignatory operators.
 
 
 4
 It is clear, therefore, that the Board has not decided or even cast any doubt on the validity of the basic royalty provision of forty cents per ton but instead has limited its inquiry to the effect under 8(e) of the exaction from the coal operators of the doubled royalty where they purchased coal from outside, nonsignatory operators. The basic provision of forty cents royalty per ton for coal produced by the employer is radically different from the special provision requiring an eighty cents royalty on coal acquired from outside nonsignatory operators and standing alone is beyond the range of 8(e). The essence of a proscribed 'hot cargo' agreement is that it applies pressure on an employer, directly or indirectly, to require him to cease doing business with a third party in order to persuade the third party to accede to the union's objectives.[5] Its focus, therefore, is on the effect of the agreement upon the relationship of the employer who is a party to the collective bargaining agreement with an outside employer. The Board recognized this in its second decision in Raymond O. Lewis, supra, where it held that the requirement of an eighty cent royalty on coal acquired from nonsignatory operators was to restrain signatory operators from acquiring coal from nonsignatories and thus to limit the coal operators' relationships to other operators who had signed a union contract. This element of discrimination is of course absent from that portion of the agreement which fixes the forty cent royalty, for that has no relation to purchases from nonsignatory operators, and indeed existed independently of it before 1964.
 
 
 5
 In these circumstances, any finding by the Board that the 1964 agreement is invalid under 8(e) would not affect the severable basic royalty provision.[6] Section 8(e) does not invalidate an entire collective bargaining agreement because it contains a 'hot cargo' provision; the statute merely makes a contract with such a provision unenforceable and void to the extent that it contains the 'hot cargo' provision.[7] Indeed, it is particularly requisite in a case such as this not to allow the possible invalidity of a provision which is not operative as to these parties to afford a basis for noncompliance with a valid obligation, for the Supreme Court has pointed out that royalty payments into a welfare fund which are bargained for have the characteristics of compensation to the workers for their services.[8]
 
 II.
 
 6
 The company's claim that the agreement violates the Sherman Antitrust Act is not a defense to the trustees' action. It is now well established that the remedy for violation of the antitrust law is not avoidance of payments due under a contract, but rather the redress which the antitrust statute establishes,-- a private treble damage action. Kelly v. Kosuga, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959); Bruce's Juices, Inc. v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). See also Hanover Shoe, Inc. v. United Shoe Machinery Corp., 377 F.2d 776, 791 (3 Cir. 1967). To permit avoidance of payments required under the contract would go beyond the remedy prescribed by the antitrust statute and, as the Supreme Court has pointed out in Bruce's Juices, Inc. v. American Can Co., supra, 330 U.S. at 756-757, 67 S.Ct. 1015, would have the incongruous effect of affording an injured party simple compensatory damages where he is a defendant while allowing him to treble the identical damages where he is a plaintiff. Moreover, the general rule is especially applicable here, where as we have already pointed out the payments required by the contract have the characteristics of compensation to the employees for services they have already rendered.[9] The company claims, however, that the case falls within the exception prescribed where judicial recognition of the contract would work to enforce 'the precise conduct made unlawful by the Act.'[10] This exception is of no avail to the company, for it is directed to cases where the contract price itself has been inflated because of unlawful price fixing, whereas here there is involved a contract valid on its face and the fact that it provided the occasion for a restrictive agreement does not require that it should itself be invalidated.
 
 III.
 
 7
 The company's final defense is the alleged oral modification of the 1964 agreement. It asserts that shortly after it had terminated operation of its mine in February 1965 because of heavy losses, it reopened the mine in reliance upon the statement of the president of the local union that if it did so 'the productivity per employee would increase sufficiently to enable the Defendant to meet its obligations under the labor contract.' The company alleges that this statement was intended to induce it to reopen the mine and to incur new and additional obligations including the royalties, and that in reliance on the representation it reopened the mine but that 'the increase in productivity per employee promised and represented * * * has in fact not occurred.'
 
 
 8
 In its pleading the company presented these claims as establishing an estoppel against the plaintiffs from claiming that any royalties were due. In the court below and here, however, it has apparently abandoned this contention and instead relies upon the circumstances as creating an oral modification of the agreement to pay royalties.
 
 
 9
 We come then to the question whether there was a valid oral modification of the agreement which absolves the company of the requirement to pay the forty cents per ton royalty.
 
 
 10
 At the outset it may be observed that the alleged agreement might well be declared ineffective because it lacks definiteness and is vague and uncertain.[11] There is, however, a more fundamental objection to the alleged oral modification; this objection is based on 302(c)(5), 29 U.S.C. 186(c)(5), of the Labor-Management Relations Act, the provision under which the fund was established. This provision was written into the statute because of the special concern of Congress over the welfare fund of the United Mine Workers of America, which already was in existence and which Senator Taft described as administered without restriction by the union so that 'practically the fund became a war chest * * * for the union.'[12] It was part of the larger congressional concern over corruption of union officials and coercion of employers, to the detriment of honest bargaining relationships.[13] In 302 of the Labor-Management Relations Act, 29 U.S.C. 186, Congress therefore imposed a maximum penalty of imprisonment for one year and a fine of $10,000 for violation of its provisions, which prohibited in broad terms, with certain narrow exceptions, both the payment of anything of value by an employer and its receipt by a representative of any of his employees. One of the exceptions (302(c)(5), 29 U.S.C. 186(c)(5)) permitted employer contributions to welfare trust funds under rigid safeguards. It required that the fund be for the sole and exclusive benefit of the employees and their families and dependents, that all payments be held in trust to pay out only certain specified benefits,[14] that 'the detailed basis on which such payments are to be made is specified in a written agreement with the employer', that the employees be equally represented with the employers in the administration of the fund, together with neutral persons, that there should be an annual audit of the fund and a statement of the audit be made available for inspection by interested persons[15] and that payments intended for pensions and annuities be made to a separate trust to be used solely for that purpose.[16]
 
 
 11
 The requirement that 'the detailed basis on which such payments are to be made is specified in a written agreement with the employer * * *' (302(c)(5)(B), 29 U.S.C. 186(c)(5)(B)) is not free from ambiguity. The same phrase, 'such payments', appears in the proviso in 202(c)(5)(A), 29 U.S.C. 186(c)(5)(A), where it clearly refers to payments made by the employer. In 302(c)(5)(B), 29 U.S.C. 186(c)(5)(B), however, the language seems to look to payments to be made out of the fund by the trustees to the employees. We may not, however, determine the meaning of the provision by a microscopic study of its language in order to decide whether 'such payments' refers only to those made by the employer to the trust fund or only to those made by the trustees to the employees. We have recently been reminded of the particular emphasis which must be given to the legislative history of labor legislation,[17] and the duty which rests on the federal courts to fashion a body of federal common law for the enforcement of collective bargaining agreements.[18] It would be, at the least, incomplete to require for the benefit of the employees and to prevent collusive or fraudulent side arrangements between employers and union representatives that the benefits which the employees are to receive from union welfare funds shall be specified in a written agreement with the employer and yet to permit the written foundation on which the welfare fund rests, in this case calling for the amount of the royalties payable on coal mined, to be the subject of oral modifications. It would expose employer and union representatives alike to the temptations of corrupt bargains, for it would permit the union to extract from an employer a secret promise to pay some other amount into the fund without requiring such payments to become a matter of record and thus would frustrate the purpose of 302(c)(5). Moreover, the employees have a right to know if the obligation to make the payments into the fund is modified; otherwise they might be led to remain at their jobs in reliance on the benefits which the formal agreement has promised, after they have been eroded by oral modification of the obligation to make the payments supporting such benefits. Thus, the policy of 302(c)(5) requires that any modification of the basis of both the payments into the fund and out of the fund be made in writing. Thereby, we also preserve the prophylactic effect of informing not only the employees, but all other employers similarly situated, who should know what the arrangement is without fear of surreptitious side agreements. Congress knew that agreements such as the National Bituminous Coal Wage Agreement were the result of industry-wide bargaining and were to bind numerous employers. It knew, of course, that the elaborate collective bargaining agreements which resulted were reduced to writing;[19] it could hardly have intended that individual operators should be permitted to enter into oral side agreements with local union officials cancelling out those provisions dealing with the significant subject of payments into the union welfare fund. Whatever ambiguity lurks in the phrase 'such payments' does not justify a conclusion that the provision for payment contained in the written collective bargaining agreement may be removed by oral arrangement. On the contrary, it would take clear and unambiguous language to prescribe that in order to fall within the exceptions to the criminal sanctions of 302 only the detailed basis for the payments by the welfare fund to the employees but not the payments by the employer into the fund must be specified in the written agreement with the employer.
 
 
 12
 We hold therefore that an oral modification which would have suspended the payment of the forty cents per ton royalty into the fund by the employer was ineffective because it viclated 302(c)(5)(B).[20] Nothing in our decision in Lewis v. Mears, 297 F.2d 101 (3 Cir. 1961), cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962), forecloses this conclusion. That case held only that parole evidence was admissible to show that the written agreement to make payments into a welfare trust never became effective because it was not fully executed and delivered. Here, on the other hand, it is agreed that a valid written contract existed which obligated the company to make royalty payments into the fund, under which the company in fact made substantial payments, but a claim is made of an oral arrangement which later suspended or modified it. Such an oral agreement to suspend or modify an existing written contract falling within 302(c)(5)(B) is invalid and there can be no estoppel against the assertion of the public policy which condemns it.
 
 
 13
 The judgment of the district court will be affirmed.
 
 
 14
 GERALD McLAUGHLIN, Circuit Judge (dissenting).
 
 
 15
 The appeal here is from the granting of a motion for summary judgment by the District Court. The significant facts are simple and admitted. The union involved, through its president whose authority is conceded, agreed with appellant mine owner that if the latter would reopen its mines (which it had permanently closed) the employee productivity would increase sufficiently to enable the mines owner to meet all its obligations under an existing collective bargaining contract. Relying on that agreement, which clearly modified the underlying agreement requiring appellant to pay royalties to the union's welfare fund, appellant opened its mines. The employees did not increase their productivity and so enable appellant to pay royalties to the welfare fund. As a result appellant had to shut down its mines. Notwithstanding that situation, the trustees of the welfare fund brought this suit for said royalties and in the face of the above facts, the District Court granted the trustees' motion for summary judgment.
 
 
 16
 Both equitable estoppel and oral modification of the 1964 labor contract were urged by appellant in the District Court as defeating the present action. The trial judge held that such oral modification was against public policy on the strength of Lewis v. Harcliff Coal Co., 237 F.Supp. 6, 8 (W.D.Pa.1965). The oral agreement there was prior to the written contract. The decision is no authority to uphold the brazen repudiation of the subsequent oral agreement in this appeal. This Court in Burlesque Artists Assn. v. I. Hirst Enterprises, Inc., 267 F.2d 414 (3 Cir. 1959) affirmed a judgment where the jury had found that there had been a valid subsequent oral addition to the original written labor agreement. This recognition of subsequent oral modification of collective bargaining contracts is viewed as sound in labor arbitration practice. Gertman Co., Inc., 45 LA 30 (Thomas Kennedy Arbitration 1965). Metropolitan Transit Authority, 39 LA 849 (W. Fallon Arbitration, 1965).
 
 
 17
 The District Court considered that the modification to the original agreement under 29 U.S.C.A. 186(c)(5)(B) had to be in writing. The majority opinion does not agree with that. It cautiously considers that the statute 'is not free from ambiguity'. However, it never does construe it and simply goes on to fashion new law to support this judgment. I think it very clear that Section 302(c)(5)(B) of the L.M.R. Act does not touch the validity of the oral modification before us. In our Bey v. Muldoon, 354 F.2d 1005 (3 Cir. 1966) we affirmed the District Court, 223 F.Supp. 489, in holding regarding 302(c)(5)(B) that 'Reference to the legislative history shows that the Act was intended to prohibit any receipt of money by unions from employers unless the precise use to which the money shall be put is delineated.' Absent a statutory provision that the oral modification involved is required by statute to be in writing that subsequent agreement is itself a valid contract. United Shoe Workers, etc. v. Le Danne Footwear, Inc., 83 F.Supp. 714 (D.Mass.1949).
 
 
 18
 The District Court not only disposed of the above most substantial controverted issue by summary judgment but also so disposed of appellant's affirmative defenses of illegality. It is impossible to conjure away the vital fact questions raised. Appellant contended that the Welfare and Retirement Fund clause of the National Bituminous Coal Wage Agreement was illegal under either or both the National Labor Relations Act and The Sherman Anti-trust Act. The District Court opinion concedes that the 1964 Amendment to the Welfare and Retirement Clause of the said Agreement with respect to its 80 cents per ton payment into the Fund by the signatory operator was held to be violative of Section 8(e) of the National Labor Relations Act. The motion of the union to have the Amendment declared valid was denied by the Board. The finality of the decision of that issue was stated by the District Court as still pending. Confronted by that inescapable situation, the Court disposed of the problem by holding that the plaintiffs' claim in this suit was not under the 80 cents provision of the Amendment but the older 40 cents provision, stating that 'this being so, then the partial or even the entire invalidity of the Agreement would not alter the obligation to pay for the work already performed.' From any reasonable viewpoint such an arbitrary disposal of the 1964 Amendment cannot be accomplished on this summary motion. At the very least appellant is entitled to its day in court to show the intent of the parties with reference to the Amendment. Genuine, substantial questions of fact were presented to the District Court. They called for a trial on the merits of those issues, inclusing the counterclaim of the defendant.
 
 
 
 [1]
 The counterclaim was in the amount of $88,322.20, representing payments made at forty cents per ton
 
 
 [2]
 The new addition, somewhat circumstantially phrased, reads: 'On all bituminous coal procured or acquired by any signatory Operator for use or for sale there shall, during the life of this Agreement, be paid into such Fund by each such Operator signaory hereto or by any subsidiary or affiliate of such Operator signatory hereto the sum of eighty cents (80cents) per ton of two thousand (2Ooo) pounds on each ton of such bituminous coal so produced or acquired on which the aforesaid sum of forty cents (40cents) per ton has not been paid into said fund prior to such procurement or acquisition.'
 
 
 [3]
 See 350 F.2d at 802, n. 12
 
 
 [4]
 Compare San Diego Bldg. Trades Council, etc. v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) with Vaca v. Sipes, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582 (1966); Comment, 113 U.Pa.L.Rev. 1104 (1965)
 
 
 [5]
 National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612 (1967); A. Duie Pyle, Inc. v NLRB, 383 F.2d 772 (3 Cir. 1967)
 
 
 [6]
 See NLRB v. Rockaway News Supply Co., Inc., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953)
 
 
 [7]
 8(e), 29 U.S.C. 158(e)
 
 
 [8]
 Lewis v. Benedict Coal Corp., 361 U.S. 459, 469, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960)
 
 
 [9]
 Lewis v. Benedict Coal Corp., supra, n. 8
 
 
 [10]
 Kelly v. Kosuga, supra, 358 U.S. at 520, 79 S.Ct. at 432
 
 
 [11]
 Zukoski v. Baltimore & Ohio Railroad Co., 315 F.2d 622, 625 (3 Cir. 1963), cert. denied, 375 U.S. 856, 84 S.Ct. 118, 11 L.Ed.2d 83 (1963)
 
 
 [12]
 93 Cong.Rec. 4746, reprinted in 2 Legis.Hist. of the Labor-Management Relations Act, 1947, pp. 1310-11. See also S.Rep.No. 105, 80th Cong., 1st Sess. 52 (Supplemental Views), reprinted in 1 Legis.Hist. Hist. 458; 93 Cong.Rec. 3565-66, 3569, 1 Legis.Hist. 754-57; 93 Cong.Rec. A1910, 1 Legis.Hist. 869 (remarks of Rep.Meade); 93 Cong.Rec. 4678, 2 Legis.Hist. 1305 (remarks of Sen. Byrd); 93 Cong.Rec. 5015, 2 Legis.Hist. 1498 (remarks of Sen. Ball)
 
 
 [13]
 See Arroyo v. United States, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915 (1959); United States v. Ryan, 350 U.S. 299, 76 S.Ct. 400, 100 L.Ed. 355 (1956)
 
 
 [14]
 302(c)(5)(A), 29 U.S.C. 186(c)(5)(A)
 
 
 [15]
 302(c)(5)(B), 29 U.S.C. 186(c)(5)(B)
 
 
 [16]
 302(c)(5)(C), 29 U.S.C. 186(c)(5)(C)
 
 
 [17]
 National Woodwork Manufacturers Association v. NLRB, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); NLRB v. Allis-Chalmers Mfg. Co., 388 U.S. 175, 87 S.Ct. 2001, 18 L.Ed.2d 1123 (1967)
 
 
 [18]
 Lewis v. Benedict Coal Corp., 361 U.S. 459, 470, 80 S.Ct. 489, 4 L.Ed.2d 442 (1960)
 
 
 [19]
 See 8(d), 29 U.S.C. 158(d); H.J. Heinz Co. v. NLRB, 311 U.S. 514, 61 S.Ct. 320, 85 L.Ed. 309 (1941)
 
 
 [20]
 See Lewis v. Lowry, 295 F.2d 197, 200 (4 Cir. 1961), Sobeloff, Ch. J., dissenting, cert. denied, 368 U.S. 977, 82 S.Ct. 478, 7 L.Ed.2d 438 (1962). See also Lewis v. Mears, 297 F.2d 101, 105 (3 Cir. 1961), Biggs, Ch. J. dissenting from denial of rehearing en banc, cert. denied, 369 U.S. 873, 82 S.Ct. 1142, 8 L.Ed.2d 276 (1962)