Clarence P. FORET, etc.

v.

Richard GREENLAND, et al.

Civ. A. Nos. 78–2352, 78–2354.

United States District Court,
E. D. Louisiana.

July 9, 1982.

Paul A. Bonin, New Orleans, La., for plaintiff.

Douglas Draper, New Orleans, La., Harry A. Burglass, Metairie, La., Frank Tranchina, Kenner, La., Edward Rodrigue, Jr., New Orleans, La., for defendants.

**19.** So, too, the Corporation Counsel vigorously and competently represented defendants-councilors.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. Plaintiff in these two consolidated actions is Clarence P. Foret, in his capacity as trustee of New Orleans Barge Lines Pension Plan and C.J.&S. Marine Pension & Profit Sharing Plan.

2. Defendants are Richard L. Greenland and Richard J. Kelley, Jr., both of whom served with plaintiff as trustees of the two pension plans; St. Paul Fire & Marine Insurance Company, the professional liability insurer of Richard L. Greenland; and Associated Financial Consultants, Inc. Also named as defendants are Gerald G. Pfister and Arealco, Inc., the recipients of two loans from the pension plan funds.

3. In 1972 or 1973, defendants Greenland, an attorney, and Kelley, an accountant, along with Bart Johnson, an insurance agent, united their talents to form a corporation known as Associated Financial Consultants, Inc. (hereinafter "AFC"). Each owned one-third of the corporation's stock and equally shared the profits derived from the corporation's business consulting endeavors.

4. Defendant St. Paul Fire & Marine Insurance Company issued an insurance policy to defendant Greenland's law firm, McClendon, Greenland & Denkman, which provided professional liability coverage from July 1, 1974, to July 1, 1975.

5. Sometime in 1974, C.J.&S. Marine Service and Sales, Inc. (hereinafter "C.J. &S.") and New Orleans Barge Lines, Inc. (hereinafter "Barge Lines") contracted with AFC to determine the feasibility of a pension and profit sharing plan for each corporation and, if feasible, to establish same. Plaintiff Foret, who owned 67% of C.J.&S. stock and 100% of Barge Lines stock, acted as principal representative of both corporations.

Basically relying upon a corporate prototype pension plan and trust prepared by Sun Life Assurance Company of Canada, AFC set up the two plans which were adopted on December 20, 1974. The plan named Greenland, Kelley and Foret as trustees.

For consultation and other services rendered in connection with the pension plans, AFC billed C.J.&S. and Barge Lines $3,000.

6. Under the terms of the pension plans, Foret, acting for the employer companies (C.J.&S. and Barge Lines), had the power to appoint and remove trustees.

7. Though empowered as noted above, Foret did not fully understand the scope of his duties and responsibilities as pension plan trustee.

8. The funds of the C.J.&S. and Barge Lines pension plans were deposited into custodial checking accounts and, as of January 31, 1975, totalled $18,420 and $11,500, respectively. Under the terms of the deposits, any individual trustee could issue checks. However, under the terms of the pension plans, the approval of two trustees was necessary to authorize a loan of pension plan funds.

9. Thereafter, loans were made from the two funds to Gerald Pfister, a friend and former business associate of Kelley. Kelley desired the pension plan funds to draw interest. Thus, after learning that Pfister was interested in borrowing money, Kelley approached Greenland for approval of the loans. Kelley co-owned a building with Pfister, and was a tenant in another building owned by Pfister. Kelley also knew that General Motors leased space from Pfister and felt that this was an indication that Pfister would be a good credit risk. Greenland had seen Pfister's personal financial statement which apparently indicated that Pfister was financially sound and had considerable net worth. Neither Kelley nor Greenland inquired as to why Pfister needed or wanted to borrow the money. On the basis of Pfister's financial statement,

Greenland decided that it was not necessary to otherwise secure the loan as long as Pfister guaranteed the promissory notes in his individual capacity. Greenland was not concerned that Kelley was proposing to reduce the pension plan funds by more than half. Greenland made his approval of the loans contingent upon Foret's approval.

10. Thus, on March 6, 1975, Kelley signed two checks payable to Arealco, Inc., a real estate business owned by Pfister and his family. The first check, drawn from the C.J.&S. pension plan account, was for $10,000. The second, drawn from the Barge Lines account, was for $7,000. Each check contained a notation in the lower left-hand corner "For 90 day note." Due to a change in plans subsequent to the signing of the checks, Pfister executed two promissory notes payable one year after the date of execution. The notes state that interest was to be paid at the rate of 8% from maturity on principal amounts of $11,500 and $8,050.

11. On the same day, a check drawn on Arealco's account was issued to AFC in the amount of $340. Pfister and Kelley testified that this amount did not represent any sort of commission or finder's fee but, instead, was based on time spent by AFC in connection with consultation on the loan transaction. Greenland had no knowledge of these payments to AFC.

12. Although not the subject of this lawsuit, Foret made two earlier loans to Arealco, for which AFC also received payment for consultation services. By a check dated December 31, 1974, Foret issued $10,000 to Arealco from a bank account designated as "Batture Leasing." On the same day, an Arealco check was issued to AFC in the amount of $200. And, by a check dated February 21, 1975, Foret issued a personal check to Arealco in the amount of $12,000. Three days later, an Arealco check was issued to AFC in the amount of $340. Regarding the payments to AFC, Pfister and Kelley testified that same were for fees for consultation and not a commission based upon a percentage of the amount loaned. Greenland had no knowledge of these payments to AFC.

13. Foret testified that he was unaware that his co-trustees were considering lending money to Pfister from the pension plans. Foret claimed that he found out about the loans only when he attempted to borrow money from the plans and learned that the funds were not available. Kelley testified, however, that he spoke to both Greenland and Foret about using the pension plan funds to lend money to Pfister. Kelley further testified that Foret made no indication of disapproval at that time. Greenland, as noted above, stated that he approved the loans because Foret had already given his approval. In light of the fact that Foret was personally involved in financial dealings with Pfister within just four months of the two pension plan loans, I find that Foret was or should have been aware of the two pension plan loans to Pfister.

14. A number of events which occurred subsequent to the making of the loans resulted in Pfister's financial instability. Starting in April 1975, within a month after the loans and promissory notes were executed, Pfister's assets were frozen pending the outcome of a divorce proceeding. In July 1975, Pfister's daughter was suddenly hospitalized and required expensive medical care. Additionally, Pfister claimed that he was still suffering from the loss of his principal financial supporter, who had died in August 1974.

15. Neither Greenland nor Kelley were aware of Pfister's financial and personal problems at the time the two loans from the pension plans were made.

16. Before the two promissory notes were due, despite whatever indications may have existed that Pfister might not be able to repay the loans, no security was demanded of him. On February 26, 1976, Kelley resigned from his position as trustee. Greenland had resigned sometime shortly before Kelley's resignation. When the notes became due on March 6, 1976, Kelley asked Pfister to pay the notes. Greenland did not attempt to secure repayment because, as he testified, he was never asked to do so.

17. On July 26, 1976, Foret, acting through former counsel, filed suit in state court against Pfister and Arealco to enforce payment of the two notes. That suit also named Kelley and Greenland as defendants. The lawsuit has not been actively pursued. The present suits were filed on behalf of Foret by current counsel on July 19, 1978.

18. With regard to the other loans made to Pfister by Foret with non-pension plan funds, Foret obtained payment after judgment was entered against Pfister and Arealco.

19. Foret engaged in two other personal transactions with the pension plans' funds. The first was a gift of pension plan funds to Foret's grandson; the second was a loan to Barge Lines. These amounts have not been repaid.

20. Foret did not file pension plan reports with the United States Department of Labor and has no record of the names or addresses of the twenty or more intended beneficiaries of the pension plans.

21. C.J.&S. as well as Barge Lines went out of business some time during late 1976 or early 1977.

### Conclusions of Law

1. This court has subject matter jurisdiction over these actions under § 502(e)(1) of ERISA, 29 U.S.C. § 1132(e)(1). Implicit in such a jurisdictional finding is that the broad sweep of ERISA's comprehensive remedial provisions covers the two subject pension plans. 29 U.S.C. § 1002(2); *Freund v. Marshall & Ilsey Bank*, 485 F.Supp. 629, 634 (1979).

2. Kelley, Greenland and Foret, as trustees of two pension plans developed for the benefit of the companies' employees, assumed the duties and responsibilities of fiduciaries with respect to such plans. As a fiduciary, each person was obliged to carry out his duties

> solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1).

3. Foret contends that Kelley and Greenland breached their fiduciary duties to the plans by, first, making the two loans to Pfister and Arealco which were never repaid, and, second, by receiving money on behalf of AFC from Pfister as commissions for arranging the loans. Foret further contends that, as professional liability insurer for Greenland, St. Paul Fire & Marine Insurance is responsible for Greenland's liability. In these consolidated actions, Foret seeks to recover the amount of the two loans to Pfister and Arealco from the recipients as well as from Kelley, Greenland and St. Paul, *in solido*. Foret further seeks to recover from Kelley and Greenland $340 allegedly representing commissions or secret profits from the loans.

4. The facts do not compel the conclusion that Kelley and Greenland failed to exercise the care, skill and prudence of a fiduciary in a like situation. Although Kelley's individual dealings with Pfister before and after the two loans as well as the questionable payments by Pfister to AFC create a suspicion of impropriety, there is sufficient evidence to show that, at the time of the loans, Pfister appeared to be a satisfactory borrower who could repay the loans with interest. Moreover, the two other loans to Arealco by Foret with his own money demonstrates that Foret himself deemed Pfister a satisfactory credit risk at about the same time the pension plan funds were loaned. And, because Foret knew or should have known of the loan of pension plan funds to Pfister, he cannot now seek to condemn such transactions as improper.

5. The overall management of the two pension plans fell short of the standards set by ERISA. The failure to file annual reports and other documents required by 29 U.S.C. § 1024 is only one example of poor management. Foret's personal use of pension plan funds on two occasions is another example. More importantly, the fact that Foret, as the last trustee, maintained no

records of the intended beneficiaries of the plans reflects a serious disregard for the underlying purpose of the pension plans.

6. Even assuming that this court were to find that Kelley or Greenland breached their fiduciary duties to the pension plans, an award of equitable relief to the plans would be meaningless if not improper. An award for breach of fiduciary duties to an employee pension plan should be fashioned so as to be most advantageous to the participants and beneficiaries of that plan. *Freund v. Marshall & Ilsey Bank, supra,* 485 F.Supp. at 643. Within the context of the two now defunct plans, this guiding principle precludes any type of award to Foret where the identities and whereabouts of the beneficiaries are unknown.

7. It is clear that Pfister's obligation to repay the two loans remains unsatisfied. However, in light of the state court action previously filed by Foret to collect on these two notes, there is no sufficient justification for this court to assert pendent jurisdiction over such claim here. Accordingly, Foret may continue to pursue such collection remedies as remain available to him in state court.

8. There being insufficient proof of a breach of fiduciary duties by Greenland or Kelley, the issue of St. Paul's alleged liability as Greenland's professional liability insurer is moot.

9. Plaintiff's complaint against defendants Greenland, Kelley and AFC must be dismissed. Plaintiff's complaint against defendants Pfister and Arealco must be dismissed for lack of subject matter jurisdiction. Defendants are instructed to submit a judgment consistent with these findings and conclusions.