George M. NACHWALTER and Steven M. Falk, as Trustees of the Nachwalter, Christie and Falk, P.A. Profit Sharing Plan and Trust, and as Trustees of the Nachwalter, Christie and Falk, P.A. Pension Plan and Trust, Plaintiffs,

v.

Joyce Ellen CHRISTIE, individually and as Personal Representative of the Estate of Irwin G. Christie, Defendant.

No. 82–0104–CIV.

United States District Court, S.D. Florida, S.D.

June 12, 1985.

Kenny, Nachwalter & Seymour, P.A., Miami, Fla., for plaintiffs.

Blank, Rome, Comisky & McCauley, Miami, Fla., for defendant.

ORDER AND FINDINGS OF FACT AND CONCLUSIONS OF LAW

JAMES LAWRENCE KING, Chief Judge.

The above-styled action for declaratory judgment by the trustees of two Employee

Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, protected retirement plans came on for trial before this Court on August 14, 1984.

Based upon the entire record in these proceedings and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure and the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, the findings of fact and conclusions of law of this Court are:

*Findings of Fact*

1. Plaintiffs George M. Nachwalter and Steven M. Falk now and have at all times been Trustees of two employee benefit plans administered in Dade County, Florida:

(a) The Nachwalter, Christie & Falk, P.A. Profit Sharing Plan and Trust ("the Profit Sharing Plan"); and

(b) The Nachwalter, Christie & Falk, P.A. Pension Plan and Trust ("the Pension Plan").

2. Irwin G. Christie died on January 7, 1982.

3. Prior to his death, Irwin G. Christie was a beneficiary and participant of the Profit Sharing Plan and the Pension Plan.

4. Prior to his death, Irwin G. Christie designated his wife, Joyce E. Christie, as his beneficiary to receive benefits under the Profit Sharing Plan and the Pension Plan in the event of his death.

5. On February 5, 1982, Joyce E. Christie was appointed and is the personal representative of the Estate of Irwin G. Christie.

6. The Profit Sharing Plan was established by Nachwalter, Christie & Falk, P.A., the employer and plan sponsor, effective September 1, 1974, restated effective July 1, 1975, executed on August 24, 1976, and thereafter amended April 14, 1977, December 28, 1977, and June 25, 1979.

7. The Pension Plan was established by Nachwalter, Christie & Falk, P.A., the employer and plan sponsor, effective July 1, 1975, executed on August 24, 1976, and thereafter amended April 14, 1977, December 28, 1977, and June 25, 1979.

8. The anniversary date of the Profit Sharing Plan and of the Pension Plan (hereinafter the "Plans") is July 1 of each year, and the fiscal year for each ends June 30 of each year.

9. Irwin G. Christie submitted his resignation from Nachwalter, Christie & Falk, P.A. (the "firm") on or about October 23, 1980, and terminated his employment on November 30, 1980, and on or about December 1, 1980, established his own law office. From the date of formation of the firm on or about June 24, 1974, until November 30, 1980, Irwin G. Christie was a stockholder, employee, officer, and director of the firm. From the date on which the Plans were established until his termination, there were three trustees under both Plans: George M. Nachwalter, Steven M. Falk, and Irwin G. Christie.

10. Irwin G. Christie's account balances valued as of fiscal year end, June 30, under the Plans have been stated as follows:

|  | Profit Sharing Plan | Pension Plan | Total of Two Plans |
|---|---|---|---|
| 6/30/78 | $ 45,192.06 | $22,327.72 | $ 67,519.78 |
| 6/30/79 | 85,294.48 | 37,977.42 | 123,271.90 |
| 6/30/80 | 75,702.23 | 48,963.26 | 124,665.49 |
| 6/30/81 | 104,656.63 | 92,114.09 | 196,770.72 |
| 6/30/82 | 55,248.12 | 28,116.34 | 83,364.46 |

11. The total net assets of the trusts established under the two Plans valued as of fiscal year end, June 30, have been stated as follows:

|  | Profit Sharing Plan | Pension Plan | Total of Two Plans |
|---|---|---|---|
| 6/30/78 | $149,145.31 | $ 75,905.60 | $225,050.91 |
| 6/30/79 | 283,910.29 | 120,008.32 | 493,918.61 |
| 6/30/80 | 250,157.56 | 155,858.04 | 406,015.60 |
| 6/30/81 | 342,937.91 | 304,631.02 | 647,568.93 |
| 6/30/82 | 181,036.37 | 93,623.94 | 274,660.31 |

12. Irwin G. Christie's interest in the two Plans, in accordance with the December 28, 1977, amendments, is 100% vested, and based on the stated June 30, 1981, and June 30, 1982, valuations, represented approximately 30.35% of the net assets held in trust under the two Plans.

13. On June 30, 1981, a significant portion of the assets under both Plans was invested in marketable securities held in street name by First State Securities Corp.,

including the following with values stated as of June 30, 1981:

*Profit Sharing Plan*

| 2,500 shares | Bunnington Corp. | $ 19,062.50 |

*Pension Plan*

| 10,200 shares | Aerosonic Corp. | $122,400.00 |
| 8,000 shares | Bunnington Corp. | $ 91,000.00 |
| 6,000 shares | Osrow Products Corp. | $ 15,000.00 |
| Total: | | $247,462.50 |

These securities represented approximately 32% of the total assets of the two Plans aggregated, 4% of the Profit Sharing Plan, 75% of the Pension Plan.

14. On July 24, 1981, the Securities Investors Protection Corporation acting under the Securities Investor Protection Act of 1970, as amended, 15 U.S.C. § 78aaa, *et seq.,* filed an application in the United States District Court for the Southern District of Florida (*Securities Investors Protection Corporation v. First State Securities Corp.,* Civil Action No. 81–1566–JLK) for an order adjudicating that customers of First State Securities Corp. are in need of protection afforded by the Securities Investors Protection Act. SIPA's application was granted, and on July 29, 1981, the United States District Court in that action appointed John L. Britton as trustee for the liquidation of the business of First State Securities Corp. The two Plans, through counsel, have filed claims with the Trustees.

15. During the period from June 30, 1981, through July 24, 1981, First State Securities Corp. engaged in transactions without authority and approval for the account of the two Plans, and purported to sell the Bunnington Corp. stock and purchase with the proceeds additional Aerosonic and Osrow stock.

16. According to the Securities Investor Protection Corp., First State Securities Corp. had engaged in a scheme with others including two other registered broker dealers, Joseph Sebag, Incorporated, and Investors Financial Services, Inc., to manipulate the price of Bunnington Corp., Aerosonic Corp., and Osrow Products Corp. Two

SIPC receivership actions were filed and granted in July 1981, and an investigation commenced from which a complaint charging RICO violations, securities fraud, and breach of fiduciary duty was ultimately filed. The effect was a precipitous drop in the market price of Bunnington, Aerosonic, and Osrow beginning in early July 1981. As of June 30, 1982, the next Plan valuation date, the total value of the two Plans had declined to $274,660.31, and the value of Christie's interests in the two Plans had decreased to $83,364.46.

17. The trustees have retained counsel to institute an action or actions under the securities laws and/or for fraud and other violations of law against persons who were involved in or were responsible for the losses and damages sustained by the two Plans as a result of the First State Securities' transactions.

18. The two Plans provided by Section 5.01 that:

*Break-In-Service*—If a Participant has a Break-In-Service, he shall thereupon become a Withdrawn Participant, and his interests and rights under this Plan shall be limited to those rights hereinafter provided in this Article.

For purposes of this Article, a Break-In-Service shall mean a Vesting Computation Period during which an Employee does not complete more than five hundred (500) Hours of Service with the Employer.

19. A Vesting Computation Period, such as referred to in Section 5.01 is defined by Section 1.48 as "the Plan Year." The Plan Year, as referred to in Section 1.48 is defined by Section 1.40 as "the twelve (12) month period ending on the last day of the Fiscal Year of the Company." The last day of the fiscal year of the Company (Nachwalter, Christie & Falk, P.A.) is June 30th of each year.

20. During the Plan Year (or fiscal year) ending June 30, 1981, Irwin G. Christie did not incur a break-in-service as defined in the Plans.

21. Between July 1, 1981, and January 7, 1982, Irwin G. Christie was not reemployed by the Company. He would have had a break-in-service as defined in the Plans as of June 30, 1982.

22. The Plans provide by Section 5.08 that:

*Section 5.08 Disposition of Amounts Vested in Terminated Participants*

(a) Immediate Distribution—In the event a Participant becomes a Terminated Participant prior to his retirement, death, or disability, and the then Vested Account Balance in accordance with the schedule in Section 5.07 (computed, as if said Participant incurred a Break-in-Service upon his termination) shall not exceed $1,750 (or any lesser amount as may, by regulations of the Secretary of the Treasury, be established as the maximum amount as may be paid out in such event without the Participant's consent), the Plan Administrator may (but is not required to) direct the Trustees to distribute the then value of the Vested Account Balance to the Participant. If the then value of the Participant's Vested Account Balance exceeds the dollar amount specified in the preceding sentence, the Participant may file with the Plan Administrator a written request for the payment of the entire amount of his Vested Account Balance, and the Plan Administrator may (but is not required to) direct the Trustees to pay out this amount. The Plan Administrator shall determine whether or not to distribute the Vested Account Balance or consent to the distribution of a Vested Account Balance in accordance with the preceding subsections in a uniform and nondiscriminatory manner. The request by the Participant for a payment by the Plan Administrator for distribution of the Participant's nonforfeitable amount in excess of $1,750 (or such lesser amount as may be prescribed by the Secretary of the Treasury as regards such payment) must be made no later than thirty (30) days after he becomes a Terminated Participant and any payment may be made no earlier than sixty (60) days nor later than one year after he becomes a Terminated Participant. This provision is intended to preclude constructive receipt of any trust assets in the event the Participant fails to make the request within the prescribed time.

(b) Deferred Distribution of Vested Account Balance—In the event a Participant becomes a Terminated Participant prior to his retirement, death, or disability, and the then Vested Account Balance in accordance with the schedule in Section 5.07 (computed, as if said Participant incurred a Break-In-Service upon his termination) shall not exceed $1.750 (or any lesser amount as may, by regulations of the Secretary of the Treasury, be established as the maximum amount as may, by regulations of the Secretary of the Treasury, be established as the maximum amount as may be paid out in such event without the Participant's consent), the Plan Administrator may (but is not required to) direct the Trustees to distribute the then value of the Vested Account Balance to the Participant. If the then value of the Participant's Vested Account Balance exceeds the dollar amount specified in the preceding sentence, the Participant may file with the Plan Administrator a written request for the payment of the entire amount of his Vested Account Balance, and the Plan Administrator may (but is not required to) direct the Trustees to pay out this amount. The Plan Administrator shall determine whether or not to distribute the Vested Account Balance of consent to the distribution of a Vested Account Balance in accordance with the preceding subsections in a uniform and nondiscriminatory manner. The request by the Participant for a payment by the Plan Administrator for a payment by the Plan Administrator for distribution of the Participant's nonforfeitable amount in excess of $1,750 (or such lesser amount as may be prescribed by the Secretary of the Treasury as regards such payment) must be made no later than thirty (30) days after he becomes a Terminated Participant and any payment may be made

no earlier than sixty (60) days nor later than one year after he becomes a Terminated Participant. This provision is intended to preclude constructive receipt of any trust assets in the event the Participant fails to make the request within the prescribed time.

(b) Deferred Distribution of Vested Account Balance—In the event a Participant becomes a Terminated Participant prior to his retirement, death, or disability, and

(1) If the then value of such Vested Account Balance does not exceed One Thousand Seven Hundred Fifty ($1,750) Dollars (or such lesser amount as may be prescribed by regulations of the Secretary of the Treasury governing such payments), and the Plan Administrator does not elect to direct the Trustees to distribute the then value of the Vested Account Balance to the Participant, or

(2) If a Participant does not consent to the payment by the Trustees (if authorized by the Plan Administrator) of all of his Vested Account Balance, and if the then value of the Vested Account Balance exceeds One Thousand Seven Hundred Fifty ($1,750) Dollars (or such lesser amount as may be prescribed by regulations of the Secretary of the Treasury governing such payments), or

(3) If the then balance of such Vested Account Balance exceeds One Thousand Seven Hundred Fifty ($1,750) Dollars (or such lesser amount as may be prescribed by regulations of the Secretary of the Treasury governing such payments), and the Plan Administrator does not elect to direct the Trustees to distribute (whether or not consented to by the Participant) the then value of the Vested Account Balance to the Participant,

Then the Vested Amount standing to credit of his account shall be retained as follows:

(4) (See Article XII, Section 12.15 for roll-over transfers of such interest to other qualified Plans in certain circumstances.) In all events payment of such retained vested benefits will begin under the payment options provided in Article VI hereof as if he were a Participant at the time of the commencement of such payments, which commencement shall, unless the Terminated Participant elects otherwise, be not later than the sixtieth (60th) day after the latest of the close of the Plan Year in which (A) the Participant attains his Normal Retirement Age, (B) there occurs the tenth anniversary of the year in which the Participant commenced participation in the Plan, or (C) the Participant terminates his service with the Company, provided, that if the Participant is fully vested at the time of his termination, then "Normal Retirement Age" as used in clause "(A)" of this sentence shall be construed to mean "Early Retirement Age." No further contributions shall be made to any Terminated Participant. In the event payment of benefits to a Terminated Participant is deferred under this subsection (b), he shall continue to share in accretions and losses in accordance with the provisions of Article IV, Section 4.02 hereof, except as provided for in Section 5.11 below.

(5) In the event payment of benefits to a Terminated Participant is deferred to a later date, the Plan Administrator shall furnish to each such Terminated Participant an Individual statement setting forth all information with respect to such Participant as to his Nonforfeitable Account Balance, etc., that is required to be contained in the Annual Registration Statement filed with the Secretary of the Treasury of his delegate under section 6057(a) of the Internal Revenue Code of 1954, as amended. See Also Article XI, Sections 11.07 and 11.08 for further disclosure requirements.

23. The Plans provide by Section 5.08 that a "terminated participant" may file a written request for payment of his entire vested account balances "no later than thirty (30) days after he becomes a Terminated Participant." The Plan Administrator, in this case the trustees, "may (but is not required to) direct the Trustees" to pay out the entire vested account balances to the terminated participant. The Plans provide

that the decision as to whether or not to pay out the entire vested account balance, in accordance with such a written request, is to be made "in a uniform and nondiscriminatory manner."

24. Section 1.43 of the Plans states that a "Terminated Participant," as referred to in Section 5.08:

shall mean (a) Participant who has not yet incurred a Break-In Service and (b) who has permanently terminated (by action of the Company by discharging him, or by his own action through quitting, other than by retirement, death, or permanent disability) his employment with the Company. A Terminated Participant shall become a Withdrawn Participant upon the occurrence of a Break-in-Service. A Terminated Participant who is reemployed by the Company shall be entitled to reparticipate in the Plan on the next Anniversary Date on which he meets the requirements of Article II. If such Terminated Participant is rehired before he becomes a Withdrawn Participant he may also be entitled to his prior Account Balance without reduction for forfeitures depending on the provisions of Article V. Participants whose employment is terminated due to death, permanent disability or retirement shall be considered as Retired Participants, Deceased Participants, or Disabled Participants, as the case may be.

Section 1.49 of the Plans also states that a "Withdrawn Participant," as referred to in Section 1.43 "shall mean a Terminated Participant who has incurred a Break-In-Service."

25. Irwin G. Christie became a Terminated Participant on November 1, 1980, as defined in the Plans.

26. Irwin G. Christie would have become a Withdrawn Participant on June 30, 1982, as defined in the Plans.

27. The Plans provide by Section 5.10 that:

*Disposition of Amounts Vested in Withdrawn Participants*—In the event that a Participant becomes a Withdrawn Participant without having received a distribution under Section 5.08(a), the Plan Administrator may (but is not required to) direct the Trustees to distribute the then value of the vested Account Balance to the Participant, provided that such Withdrawn Participant has filed a written reqeuest for such payment with the Plan Administrator not later than thirty (30) days following the last day of the Plan Year in which such Participant became a Withdrawn Participant. The Plan Administrator may (but is not required to) make such payment at such time after a determination can be made concerning the forfeiture of such Withdrawn Participant's nonvested Account Balance in accordance with Sections 5.01 through 5.07 hereof, and not later than sixty (60) days following the later of (a) the last day of the Plan Year in which such Participant became a Withdrawn Participant or (b) the earliest date upon which the amount payable can be ascertained, as the Plan Administrator may, in its sole discretion, determine. Should a Withdrawn Participant not make the election (that is, written request) as herein provided, or should the Plan Administrator not direct the Trustees to make payment, then such Withdrawn Participant's vested Account Balance shall be retained in the same manner and for the same period as the vested Account Balance of a Terminated Participant is retained under Section 5.08(b).

28. The Plans provide by Section 5.10 that a "Withdrawn Participant" may file a written request for payment of his entire vested account balances "not later than thirty (30) days following the last day of the Plan Year in which such Participant became a Withdrawn Participant." The Plan Administrator, in this case the Trustees, "may (but is not required to) direct the Trustees" to pay out the entire vested account balances to the withdrawn participant.

29. In accordance with Section 1.32 of the Plans, upon Irwin Christie's death on January 7, 1982, Joyce Christie as Irwin Christie's designated beneficiary was enti-

tled to 100 percent of the balance in Irwin Christie's accounts in the two Plans, determined and paid in accordance with the terms of the Plans.

30. Defendant Joyce Christie, individually, as Irwin G. Christie's designated beneficiary under the two Plans, would be entitled to Death Benefits under the two Plans unless payment should have been made to Irwin G. Christie prior to his death. If payment should have been made to Irwin G. Christie prior to his death, then payment should now be made to the Estate of Irwin G. Christie through Defendant Joyce Ellen Christie as Personal Representative of the Estate of Irwin G. Christie.

31. The Trustees are fiduciaries.

32. Where any finding of fact, in whole or in part, can be deemed a conclusion of law, it shall. Where any conclusion of law, in whole or in part, can be deemed a finding of fact, it shall.

*Conclusions of Law*

1. Neither Irwin G. Christie or his representatives made a written request for immediate distribution of his Plan account balances within the meaning of Section 5.08 of the Plans during the thirty-day period from November 30, 1980, the date of Irwin G. Christie's termination, through December 30, 1980. Defendant contends that the following correspondence constitutes such a request:

(1) 12/1/80 letter from Richard Cotler to Stephen Liedman. (Trial Exhibit B, August 14, 1984.)

(2) 12/2/80 letter from Y. Stephen Liedman to Richard Cotler. (Trial Exhibit C, August 14, 1984.)

(3) 12/16/80 letter from Herbert Stettin to Y. Stephen Liedman. (Trial Exhibit D, August 14, 1984.)

(4) 12/23/80 letter from Y. Stephen Liedman to Herbert Stettin. (Trial Exhibit E, August 14, 1984).

However, the above correspondence reflects discussions only about valuation and distribution in the future as of June 30, 1981, and Section 5.08(a) only permits immediate distribution of the then value—the June 30, 1980, value—and not value in the future on June 30, 1981.

2. Defendant contends that Messrs. Nachwalter, Christie and Falk reached an oral agreement to value Mr. Christie's account balances in the Plans as of June 30, 1981, and to render lump sum payment within a reasonable time, irrespective of the terms of the Plans.

■ As discussed in number 1 above, an agreement to make an immediate distribution based upon the *following* valuation— the June 30, 1981, valuation rather than based upon the "then value" —the June 30, 1980, value—would be contrary to the express terms of the Plans. However, while the Trustees deny that such an oral agreement was ever reached, even if such an oral agreement is assumed *arguendo*, such oral agreement to vary the express terms of the Plans is not enforceable under ERISA.

An oral agreement cannot be the basis of a cause of action under ERISA due to the fact that such an oral agreement would be contrary to the express provisions of ERISA. ERISA § 1102(a)(1) provides:

> Every employee benefit plan shall be established and maintained pursuant to a *written agreement*. (Emphasis added.)

This express requirement of a written agreement is inconsistent with defendant's attempt to prove a legally enforceable oral agreement.

The requirement that pension and profit sharing plans be established and maintained pursuant to a written agreement precludes the alteration of a plan pursuant to an oral agreement. *San Pedro Fishermen's Welfare Fund v. DiBernardo*, 664 F.2d 1344 (9th Cir.1982); *Reiherzer v. Shannon*, 581 F.2d 1266 (7th Cir.1978); *Lewis v. Seanor Coal Co.*, 382 F.2d 437 (3d Cir.1967), *cert. denied*, 390 U.S. 947, 88 S.Ct. 1035, 19 L.Ed.2d 1137 (1968); *Michota v. Anheuser-Busch, Inc.*, 526 F.Supp. 299 (D.N.J.1980); *Huge v. Overly*, 445 F.Supp. 946 (W.D.Pa.1978). Each of the above cited cases concerned Section 302(c)(5) of the Labor Management Rela-

tions Act, 29 U.S.C. § 186 (1981). This "written agreement" requirement for pensions under the Labor Management Act is very similar to the "written agreement" requirement of ERISA § 1104(a)(1). *See Hugh v. Overly*, 445 F.Supp 946, 947 n. 1 (W.D.Pa.1978).

The rationale for a "written agreement" clause in ERISA was explained in *Lewis v. Seanor Coal Co.*, 382 F.2d 437, 442–43 (3d Cir.1967):

> It would be, at the least, incomplete to require for the benefit of the employees and to prevent collusive or fraudulent side arrangements between employers and union representatives that the benefits which the employees are to receive from union welfare funds shall be specified in a written agreement with the employer and yet to permit the written foundation on which the welfare fund rests ... to be the subject of oral modifications. It would expose employer and union representatives alike to the temptations of corrupt bargains, for it would permit the union to extract from an employer a secret promise to pay some other amount into the fund without requiring such payments to become a matter of record and thus would frustrate the purpose of § 302(c)(5). Moreover, the employees have a right to know if the obligation to make the payments into the fund is modified; otherwise they might be led to remain at their jobs in reliance on the benefits which the formal agreement has promised, after they have been eroded by oral modification of the obligation to make the payments supporting such benefits.

As further explained in *San Pedro Fisherman's Welfare Fund v. DiBernardo*, 664 F.2d. 1344, 1345 (9th Cir.1982):

> The policy behind § 302(c)(5) requires that contract interpretation be confined to the written terms of the welfare trust fund agreement. Oral statements regarding the meaning of a written trust fund agreement are difficult to prove and judicial recognition of such oral statements may invite collusion and con-

troversy to the detriment of the beneficiaries. (citations omitted)

The attempt by Christie in this case to vary the express written terms of the Plans by alleging an oral agreement to alter the proper valuation date is the exact evil the statute is intended to preclude.

By similar reasoning, the "written agreement" requirements of these statutes precludes defendant's reliance upon equitable estoppel principles. As explained in *Michota v. Anheuser-Busch, Inc.*, 526 F.Supp. 299, 317 (D.N.J.1980):

> The statute requires 'the detailed basis on which ... payments are to be made' to be 'specified in a written agreement.' Accordingly, the 'vast majority' of courts have refused to apply estoppel principles to plans subject to § 302. Application of estoppel principles would 'seriously undermine the written agreement requirement of' the statute.

(Citations omitted.) See also *Reiherzer v. Shannon*, 581 F.2d 1266, 1267 n. 1 (7th Cir.1978) (citing seven other cases rejecting the use of estoppel principles in this type of case). Defendant's reliance on an oral agreement to vary the terms of the Plans or to estop the Trustees from enforcing the Plans is contrary to the statute and, thus, unenforceable.

3. Messrs. Nachwalter, Christie and Falk did not reach a written agreement, through correspondence, to value Mr. Christie's account balance in the Plans as of June 30, 1981, and to render lump sum payment within a reasonable time thereafter. Defendant contends that the following correspondence constitutes such a written agreement:

(1) 12/1/80 letter from Richard Cotler to Stephen Liedman. (Trial Exhibit B, August 14, 1984.)

(2) 12/2/80 letter from Y. Stephen Liedman to Richard Cotler. (Trial Exhibit C, August 14, 1984.)

(3) 12/16/80 letter from Herbert Stettin to Y. Stephen Liedman. (Trial Exhibit D, August 14, 1984.)

(4) 12/23/80 letter from Y. Stephen Liedman to Herbert Stettin. (Trial Exhibit E, August 14, 1984.)

■ However, the only letter that even arguably mentions an agreement at all is Trial Exhibit D. That was written by Irwin G. Christie's attorney and refers only to "a tentative understanding." Moreover, the legal principles discussed above in number 2 would apply with equal force to an alleged informal written agreement. As discussed above, the courts have enforced the statutory requirement of a formal written agreement. The courts have reasoned that the requirement of a written agreement served to protect all concerned from the collusion and controversy that the enforcement of informal agreements would invite. *See, e.g., San Pedro Fishermen's Welfare Fund v. DiBernardo,* 664 F.2d 1344, 1345 (9th Cir.1982). These dangers inherent with allowing oral agreements to modify an ERISA plan are also applicable to an informal exchange of letters. The certainty required by the statute may be effectuated only by enforcing the statute's express requirements of a carefully stated formal written plan. *See, e.g., Johnson v. Central States Southeast and Southwest Areas Pension Fund,* 513 F.2d 1173 (10th Cir.1975) (judgment of District Court enforcing benefits per booklet and letter inconsistent with plan reversed as clearly erroneous).

Just as the statute by the written agreement requirement reflects the policy of barring oral agreements, ERISA also reflects a clear policy of prohibiting informal modifications of the type alleged by defendant. The statute clearly and expressly requires that each plan shall "provide a procedure for amending such plan, and for identifying the persons who have authority to amend the plan." (29 U.S.C. § 1102(b)(3)). By expressly requiring each plan to detail the amendment procedures, Congress has rejected the use of a series of informal letters as constituting a valid modification of an ERISA plan.

■ The purported written agreement is not a modification pursuant to the terms of the Plans. The procedure for amending the Plans is detailed in Section 7.01 of the Plans. Beyond the substantive restrictions as to what can be amended, that provision requires that "[a]ny amendment to the Plan[s] shall first be approved by resolution of the Company's Board of Directors." Moreover, Section 7.01 of the Plans further requires that any amendment "be executed by the Company and the Trustees." The letters purportedly constituting the written agreement between Irwin G. Christie and the Trustees do not comply with these requirements. Thus, even assuming *arguendo,* the alleged written agreement was reached, it would be inconsistent with the Plans and ERISA and, therefore, unenforceable.

4. The amounts due to Irwin G. Christie or his estate, or to Joyce Ellen Christie, as Irwin G. Christie's designated beneficiary, should be valued as of June 30, 1982. Accordingly, the failure of the Trustees to distribute the account balances of Irwin G. Christie as stated as of June 30, 1981, to Irwin G. Christie did not constitute a breach of the terms and provisions of the Plans, and, further, the failure of the Trustees to distribute the account balances of Irwin G. Christie as stated as of June 30, 1981, to Joyce Ellen Christie, as Personal Representative of the Estate of Irwin G. Christie, did not constitute a breach of the terms and provisions of the Plans.

■ 5. Defendant contends the Trustees breached their duties under the Plans by investing Plan assets in securities purchased through First State Securities Corp., including:

Bunnington Corp.

Aerosonic Corp.

Osrow Products Corp.

Defendant further contends the Trustees breached their duty under the Plans to diversify investments by investing up to 32% of the assets of the two Plans aggregated in securities purchased through First State Securities Corp. The evidence is

clear, however, that Irwin G. Christie participated in or approved the challenged investments decisions. Moreover, Christie himself was a Trustee of the Plans and as such was responsible as a matter of law for such investment decisions. Thus, Irwin G. Christie and his estate is estopped and barred from raising a lack of diversification against his co-Trustees.

Directly on point is *Foret v. Greenland,* 542 F.Supp. 1339 (E.D.Ca.1982). In that case, one of three trustees of related pension and profit sharing plans sued the other two trustees for breach of fiduciary duty. *Id.* at 1340. The plaintiff claimed that certain investments were imprudently made. *Id.* at 1342. The court rejected the plaintiff's claim, stating that "because [plaintiff] knew or should have known of the loan of pension plan funds ... he cannot now seek to condemn such transactions as improper." *Id.*

The court's construction of ERISA in *Foret v. Greenland* is dispositive of Christie's claim here. One trustee cannot successfully claim against the other trustees because in hindsight he believes that the trust assets should have been invested differently. If Christie believed Plan assets were invested improperly, his time to object was at the time of the investment.

As *Foret v. Greenland* suggests, equitable estoppel is a proper defense to a breach of fiduciary duty claim under ERISA. *Rosenthal v. National Life Insurance Co.,* 486 F.Supp. 1018, 1023 (S.D.N.Y. 1980). Under Florida law, a failure to object results in an estoppel if the person was under an affirmative duty to speak. *Travelers Insurance Co. v. Spencer,* 397 So.2d 358, 361 (Fla. 1st DCA 1981). *See also, Travelers Indemnity Co. v. Swanson,* 662 F.2d 1098, 1102 (5th Cir.1981). As a co-Trustee, Christie had such an affirmative duty to object if Plan assets were improperly invested. Irwin G. Christie, however, made no objection, and, thus, Irwin G. Christie and his estate are estopped and barred from now raising these objections against his co-Trustees.

THEREFORE, based upon the above findings of fact and conclusions of law and pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.,* this Court does hereby ORDER, DECLARE and ADJUDGE as follows with respect to Count I of the Plaintiff Trustees' Amended and Supplemental Complaint:

1. The Plaintiff Trustees' interpretation of the Nachwalter, Christie & Falk, P.A. Profit Sharing Plan and Trust and the Nachwalter, Christie & Falk, P.A. Pension Plan and Trust is correct, the rights and interests of defendant Irwin G. Christie have been and are as set forth in Paragraph 34 of the Amended and Supplemental Complaint which states in pertinent part:

... Defendant Christie was not entitled to immediate distribution ... not having made a written request under Section 5.08(a) of the Plans within thirty (30) days of the date on which Defendant Christie became a Terminated Participant (November 1, 1980), Defendant Christie was not and would not have been entitled to request distribution again until, under Section 5.10, he would have been permitted to do so during the thirty (30) day period commencing at the end of the Plan Year when defendant Christie would have become a Withdrawn Participant as defined in the Plans.

2. The Plaintiff Trustees should not now render payment of the account balances of defendant Irwin G. Christie to defendant Joyce Ellen Christie as Personal Representative of the Estate of Irwin G. Christie.

3. The Plaintiff Trustees properly refused to make distribution to defendant Irwin G. Christie prior to his death, and to the Estate of Irwin G. Christie since his death, of defendant Irwin G. Christie's vested account balances in the Plans stated as of June 30, 1981.

This Court does further ORDER, DECLARE and ADJUDGE as follows with respect to Count II of the Plaintiff Trustees' Amended and Supplemental Complaint:

4. The plaintiff Trustees' position, as set forth in Paragraph 41 of the Amended and Supplemental Complaint is correct. That Paragraph states in pertinenet part:

The Plaintiff Trustees ... should render payment of the death benefits provided for in the two Plans to Defendant Joyce Ellen Christie, individually.

This Court does further ORDER and ADJUDGE that the plaintiff Trustees shall submit within ten (10) days from the date of this Order, an affidavit setting forth the actual attorney's fees and costs of this action for this Court's review pursuant to ·29 U.S.C. § 1132(g).